Exhibit K

# HUSCH BLACKWELL

Michael J. Schrier
Partner

1801 Pennsylvania Ave NW, Suite 1000
Washington, DC 20006
Direct: 202.378.2313
Fax: 202.378.2319
michael.schrier@huschblackwell.com

June 26, 2023

**VIA E-MAIL AND CERTIFIED MAIL**

Kennan Samman
2316 Riviera Drive
Vienna, VA 22181
E-Mail: kennan.samman@gmail.com

      Re:     Post-Employment Obligations Under Restrictive Covenants

Dear Mr. Samman:

      This firm represents Kira (US) Inc. (the "Company").  It is our understanding that you tendered your resignation from the Company as Vice President of Product Sales on June 13, 2023, and the Company has accepted your resignation.  As part of your resignation, you identified that you will be leaving the Company to join DeepJudge AG ("DeepJudge") as its new Chief Revenue Officer.

      Based on its understanding of the operations of DeepJudge and the role into which you are being hired, the Company is very concerned that your announced new employment will violate your existing post-employment contractual obligations.  To avoid confusion or doubt, we have attached a copy of both of your restrictive covenants here so that you may review them, share them with your prospective employer(s), and otherwise take appropriate action to prevent a material breach of your post-employment obligations to the Company.

      Specifically, on or about February 25, 2019, you entered into an "Assignment of IP and Confidentiality Agreement" with your then employer, Kira Inc. (the "Kira Agreement").  Of relevance here, the Kira Agreement (which contains a New York choice of law provision) contains the following provisions:

- A non-disclosure clause prohibiting the use or disclosure of any Proprietary Information (defined as "all information about software products, all inventions, discoveries, improvements, copyrightable work, source code, know-how, processes, designs, algorithms, computer programs and routines, formulae and techniques and

                                  

**HUSCH BLACKWELL**

Kennan Samman
June 26, 2023
Page 2

any information regarding the business of any customer or supplier of the Company.”);

- A non-solicitation restrictive covenant prohibiting you–for a period of 12 months from your termination from Kira–from soliciting (a) any Kira customer “for the sale of any product or service of a type then sold by the Company for which [you] provided any assistance in planning, development, marketing, training, support, or maintenance” or (b) any Kira employee for employment; and

- A noncompetition restrictive covenant prohibiting you from engaging “in the management or control of . . . any person, firm corporation or business . . . that directly and substantially competes with the products and services of the Company.”

In addition to the Kira Agreement, following the acquisition of Kira by the Company in 2021, you also signed a Restrictive Covenants Agreement with Litera Holdco LP and Litera Intermediate Holdco LLC on or about December 30, 2021 (the "Restrictive Covenants Agreement”), in exchange for Incentive Units as defined in the Third Amended and Restated Limited Partnership Agreement of Litera Holdco, LP dated as of October 20, 2021.  Of relevance here, the Restrictive Covenants Agreement (which contains a Delaware choice of law provision) contains the following provisions:

- A non-disclosure clause prohibiting the use or disclosure of any Confidential Information (defined as including, but not limited to, “information relating to a client or a vendor’s confidential or proprietary information, as well as information that assists the Partnership or any Company Group in making sales to a client or purchases from a vendor, any confidential ideas, research and development, finances, costs, profit margins, marketing, merchandising, know-how, formulas, customer lists, customer requirements, pricing, pricing methods, proprietary technology, developments, products, computer programs and techniques, work product and any other confidential or trade secret information.”);

- A non-disparagement clause that prohibits “engag[ing] in any conduct or mak[ing] any statement (orally or in writing) or releas[ing] any information that damages the reputation of, or otherwise disparages, defames or criticizes the Partnership, any Group Company, Hg, the Hg Funds, the Hg Partner, any other Partner or any of their respective Affiliates, employees, officers, directors, managers, partners or successors”);

- A non-solicitation restrictive covenant prohibiting you–for a period of 24 months from your termination date, from soliciting (a) any employee of a Group Company with whom you “had dealings during the then immediately precedent twelve (12)

# HUSCH BLACKWELL

Kennan Samman
June 26, 2023
Page 3

    calendar month period" or (b) any "existing or prospective customers, suppliers, clients, distributors, vendors, investors or other business relationships of the Partnerships or any Group Company with whom [you] first had direct or actual contact, or about whom [you] received or had access to Confidential Information, during [your] employment"; and

- A non-competition restrictive covenant prohibiting you–for a period of twelve months from your termination date,--from engaging in any Competitive Activity for a Competitor.

    Focusing solely on the Restrictive Covenant Agreement, for now, it would appear–based on all information currently available to the Company — that your announced intention to work for DeepJudge will violate at least the noncompetition provisions of the Restrictive Covenant Agreement, if not also other provisions.

    Under the Restrictive Covenant Agreement, Competitive Activity is defined as:

    rendering advice or providing any services that are the same as or similar in function or purpose as those the Management Member provided to the Partnership or any Group Company at any time during the twenty-four (24) calendar month period preceding the Termination Date, including, without limitation, providing executive leadership, product and strategy development, marketing and resource allocation guidance.

    Until June 21, 2023, you were the Vice President of Product Sales for the Company. Now, you intend to become employed as the Chief Revenue Officer for DeepJudge. As such, it would appear that the services you intend to provide to DeepJudge are "the same as or similar in function or purpose" to those you provided to the Company and squarely within the meaning of "Competitive Activity."

    Under the Restrictive Covenant Agreement, "Competitor" is defined as:

    any business that (x) engages in any business in which the Group is engaged in as of such date, but ending on the Termination Date, including without limitation, (I) the **_business of providing software for business development, pricing, marketing or talent management to the legal sector, including law firms across the world_** and (II) the **_business of providing software for drafting, proofreading, comparing, repairing, cleaning, securing documents, transaction management, contract analytics and litigation management (including any software that competes with the Litera software, including but not limited to, Litera Transact, Kira and Litigate) to legal and life sciences customers_** and others across the world or (y) otherwise engages in business that the Partnership or any Group

**HUSCH BLACKWELL**

Kennan Samman
June 26, 2023
Page 4

> Company intends, in the following twelve (12) calendar month period, to actively
> pursue in a material respect, and that has been discussed by the General Partner
> Board and of which the Management Member has knowledge

(emphasis added).

At the Company, you were responsible for generating sales, creating and maintaining customer relationships in the legal field, building and implementing pricing and strategic initiatives for the Company's products and services.  In conjunction with your role, you interacted on a daily basis with the Company's customers, namely law firms and other legal customers.  The Company's webpage makes clear that its primary customer base for all of its products and services consists of law firms and corporate legal departments, both within the United States and abroad.  https://www.litera.com/customers/  and https://www.litera.com/products/legal2/kira/customers/law-firms/ (each last accessed June 23, 2023).  "Under Delaware law, covenants not to compete with reasonable time and geographical restrictions are enforceable, although not mechanically."  *Ciena Corp. v. Jarrard*, 203 F.3d 312, 324 (4th Cir. 2000); *see also Global One Communication, LLC v. Ansaldi*, No. C165948, 2000 WL 1210511 (Va. Cir. Ct. May 5, 2000) (Virginia court applying Delaware law to enforce restrictive covenants).  Hence, the twelve-month noncompetition clause with a geographical limitation of "the United States of America and any other country in which [you] provided services . . . during the twenty-four (24) calendar month period immediately preceding [your] Termination Date" is likely both reasonable and enforceable, under the circumstances.

DeepJudge's own product webpage states that "DeepJudge is an AI-powered knowledge search that helps legal professionals swiftly find and leverage insights from large document and knowledge management systems. By understanding the true intent behind a search query, DeepJudge surfaces relevant language from your entire document collection no matter how large."  https://deepjudge.ai/product (last accessed June 22, 2023).  DeepJudge's "About Us" page states: "Coming right from the frontier of AI research, ***our founding team of AI experts redefines the role of legaltech solutions in legal practice***. Equipped with PhDs in AI and 5+ years of experience in big tech companies, ***we know how to build AI systems that deliver the levels of quality, reliability and privacy that legal workflows demand***." https://deepjudge.ai/about (last accessed June 22, 2023)(emphasis added).

Based on the foregoing public facing information from Kira/Litera and DeepJudge, it appears that: (a) DeepJudge is a "Competitor" within the meaning of the Restrictive Covenant Agreement because it sells competitive products to the "legal sector" and legal customers; and (b) your role as Chief Revenue Officer will be a violation of your existing restrictive covenant obligations to the Company.

**HUSCH BLACKWELL**

Kennan Samman
June 26, 2023
Page 5

In addition to the noncompete obligations, it would also appear virtually impossible for you to serve in the role of Chief Revenue Officer for a Competitor without also soliciting the Company's customers or using/disclosing any of the Company's Confidential Information.

In light of the foregoing and in an effort to avoid possible litigation, please provide to me (either yourself or through your counsel, if you have counsel) *by Friday, June 30, 2023, at 5 pm ET*, either:

- Written assurances that you will not be joining DeepJudge as Chief Revenue Officer (or other similarly titled position with duties similar to what you had at the Company);

  Or

- To the extent you do intend to commence employment or have already commenced employment with DeepJudge by the time you receive this letter:

  - The date you intend to commence work with DeepJudge;

  - The date you provided DeepJudge with copies of the Kira Agreement and the Restrict Covenant Agreement;

  - The job title you intend to hold at DeepJudge and a detailed description of your job duties in that role;

  - A detailed description of the DeepJudge products you intend to sell or work on;

  - An explanation of how you anticipate performing your new job in a manner that does not run afoul of your ongoing contractual obligations to the Company; and

  - A detailed explanation of how and why you contend that your work for DeepJudge, in whatever position you may ultimately hold there for the next twelve months, does not violate any provision of the Kira Agreement or the Restrictive Covenant Agreement.

At this time, the Company desires that you comply with your valid and enforceable post-employment restrictive covenants and asks that you take appropriate action to avoid imminent and material breaches of your contractual obligations.  Should you not take appropriate and timely action to avoid breaching your post-employment restrictive covenants or should you fail

# HUSCH BLACKWELL

Kennan Samman
June 26, 2023
Page 6

to timely respond to this letter, the Company will pursue —in its discretion—all appropriate
legal remedies to enforce its contractual and statutory rights.

Sincerely,

HUSCH BLACKWELL LLP

Michael J. Schrier

Enclosures

cc:     DeepJudge AG

Kira Agreement

## Assignment of IP and Confidentiality Agreement

This Assignment of IP and Confidentiality Agreement ("Agreement") is entered into on or about **FEBRUARY 25, 2019** for an indefinite period (the "Term") by and between Kira Inc., an Ontario corporation (the "Company"), and **KENNAN SAMMAN** ("Employee"). The Company and Employee are at certain times each referred to herein as a "Party", and collectively referred to herein as "the Parties."

### 1. Restrictions and Covenants.

(a)   **Employee's Assignment of his Intellectual Property Rights to the Company**.

(i)        Employee agrees that the Company will be the sole owner of any and all of Employee's "Discoveries" and "Work Product" made during the Term.  For purposes of this Agreement (A) "Project" means creation of software to review contracts or conduct due diligence investigations as well as all elements of the user interface, other systems, and marketing materials related to the commercialization of this technology, (B) "Discoveries" means all Project-related inventions, discoveries, improvements, and copyrightable works (including, without limitation, any information relating to the Company's software products, source code, know-how, processes, designs, algorithms, computer programs and routines, formulae, techniques, marketing materials, developments or experimental work, work-in-progress, or business trade secrets) made or conceived or reduced to practice by Employee during the Term, whether or not potentially patentable or copyrightable in Canada, the United States or elsewhere and (C) "Work Product" means any and all work product relating to Discoveries.

(ii)        Employee shall promptly disclose to the Company all Discoveries and Work Product. All such disclosures must include complete and accurate copies of all source code, object code or machine-readable copies, documentation, work notes, flow-charts, diagrams, test data, reports, samples, and other tangible evidence or results (collectively, "Tangible Embodiments") of such Discoveries or Work Product.  All Tangible Embodiments of any Discoveries or Work Project will be deemed to have been assigned to the Company as a result of the act of communicating any Discovery or Work Product therein.

(iii)        Employee hereby assigns and agrees to assign to the Company all of his interest in any country in any and all Discoveries and Work Product, whether such interest arises under patent law, copyright law, trade-secret law or otherwise. Without limiting the generality of the preceding sentence, Employee hereby authorizes the Company to make any desired changes to any part of any Discovery or Work Product, to combine it with other materials in any manner desired, and to withhold Employee's identity in connection with any distribution or use thereof alone or in combination with other materials.

(iv)        At the request of the Company, Employee shall promptly and without additional compensation execute any and all patent applications, copyright registration applications, waivers of moral rights, assignments, or other instruments that the Company deems necessary or appropriate to apply for or obtain patents of Canada, the United States or any other country, copyright registrations or otherwise to protect the Company's interest in such Discovery and

Work Product, the expenses for which will be borne by the Company. Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as his agents and attorneys-in-fact to, if the Company is unable for any reason to secure Employee's signature to any lawful and necessary document required or appropriate to apply for or execute any patent application, copyright registration application, waiver of moral rights, or other similar document with respect to any Discovery and Work Product (including, without limitation, renewals, extensions, continuations, divisions, or continuations in part), (A) act for and in his behalf, (B) execute and file any such document, and (C) do all other lawfully permitted acts to further the prosecution of the same legal force and effect as if executed by him; this designation and appointment constitutes an irrevocable power of attorney coupled with an interest.

(v)       To the extent that any Discovery or Work Product constitutes copyrightable or similar subject matter that is eligible to be treated as a "work made for hire" or as having similar status in Canada, the United States or elsewhere, it will be so deemed. This provision does not alter or limit Employee's other obligations to assign intellectual property rights under this Agreement.

(vi)      The obligations of Employee set forth in this Section 1 (including, without limitation, the assignment obligations) will continue beyond the termination of Employee's employment with respect to Discoveries and Work Product conceived or made by Employee alone or in concert with others during Employee's employment with the Company, whether pursuant to this Agreement or otherwise. Those obligations will be binding upon Employee and his executors, administrators, and other representatives.

(b)  **Employee's Confidentiality Obligations**.

(i)       As used in this Agreement, "Proprietary Information" means all information of a business or technical nature that relates to the Company including, without limitation, all information about software products, all inventions, discoveries, improvements, copyrightable work, source code, know-how, processes, designs, algorithms, computer programs and routines, formulae and techniques, and any information regarding the business of any customer or supplier of the Company or any other information that the Company is required to keep confidential.  Notwithstanding the preceding sentence, the term "Proprietary Information" does not include information that is or becomes publicly available through no fault of Employee, or information that Employee learned prior to employment with the Company. "Proprietary Information" includes matters that Employee conceives or develops pursuant to Employee's employment with the Company and/or through use or access of Proprietary Information, as well as matters Employee learns from other employees or independent contractors of the Company. For the avoidance of doubt, "Proprietary Information" includes all information of users of the Company's system ("Users") that Employee has access to by virtue of his work for the Company, including information that Users upload to the Company's system for processing ("User Information").

(ii)      Employee agrees that he will not, except as the Company may otherwise consent or direct in writing, reveal or disclose, sell, use, lecture upon, publish, or otherwise disclose to any third party any Proprietary Information, or authorize anyone else to do these things at any time

DocuSign Envelope ID: 631562F1439AE4F597C6C8ADDEDB01FD106

either during or subsequent to his employment with the Company. This Section 1(b) shall continue in full force and effect for two years after termination of Employee's employment with the Company; provided, however, that the confidentiality obligations of this Section 1(b) will continue in perpetuity for User Information. Employee's obligations under this Section 1(b) with respect to any specific Proprietary Information shall cease when that specific portion of Proprietary Information becomes publicly known, in its entirety and without combining portions of such information obtained separately.

(c) **Employee's Non-Solicitation Obligations.** Employee will not, without the written consent of the Company, during the Term or, for a period of one year thereafter (the "Restricted Period"), anywhere within Canada or the United States, directly or indirectly (whether as an owner, partner, shareholder, agent, officer, director, employee, independent contractor, consultant, or otherwise):

1. except on behalf of the Company, solicit any person or entity who is, or was at any time during the twelve-month period immediately prior to the termination of Employee's employment with the Company, a customer of the Company for the sale of any product or service of a type then sold by the Company for which Employee provided any assistance in planning, development, marketing, training, support, or maintenance;

2. solicit for employment any person who is, or was at any time during the twelve-month period immediately prior to the termination of Employee's employment with the Company, an employee or independent contractor of the Company; or

3. engage in the management or control of, work for, or otherwise provide services or assistance to, any person, firm, corporation or business (collectively, a "**Competing Entity**") that directly and substantially competes with the products and services of the Company. For purposes of this Agreement, a Competing Entity is limited to an entity that derives a significant amount or percentage of its total annual revenue from the sale of software/services for reviewing and/or analyzing documents and competes in one or more of the same geographic markets as the Company.

(d) **Return of Company Materials upon Termination**. Employee acknowledges that all records, documents and Tangible Embodiments containing or of Proprietary Information prepared by Employee or coming into his possession by virtue of his employment by the Company are and will remain the property of the Company. Upon termination of his employment with the Company, Employee shall, upon request of Company and at the Company's option, immediately return to the Company or destroy all such items in his possession and all copies of such items.

**5**. **Governing Law**. This Agreement shall be governed by the laws of the State of New York.

**6. Severability.** In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

**7. Entire Agreement.** This Agreement represents the entire agreement and understanding between the Company and Employee concerning Employee's employment relationship with the

DocuSign Envelope ID: 631562F1A09AE9F597596C8DDEEDB01ED186

Company and supersede in their entirety any and all prior agreements and understandings concerning Employee's employment relationship with the Company.

**8. No Oral Modification, Cancellation or Discharge.** This Agreement may only be amended, canceled or discharged in writing signed by Employee and the Company.

**9**. **Acknowledgment**. Employee acknowledges that he has had the opportunity to discuss this matter with and obtain advice from his private attorney, has had sufficient time to, and has carefully read and fully understands all the provisions of this Agreement, and is knowingly and voluntarily entering into this Agreement.


IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date above first written.


**EMPLOYEE**                          **COMPANY**

DocuSigned by:

D43277FFE42E4F1

KENNAN SAMMAN                     Noah Waisberg, Chief Executive Officer

Restrictive Covenants Agreement

## Restrictive Covenants Agreement

This Restrictive Covenants Agreement (this "Agreement") is made and entered into as of the  30  day of      December      , 2021, by and among Litera Holdco LP, a Delaware limited partnership (the "Partnership"), Litera Intermediate Holdco LLC, a Delaware limited liability company, as the sole general partner of the Partnership (together with any substitute or successor general partner appointed in accordance with the terms of the Partnership Agreement (defined below), the "General Partner"), and Kennan Samman (the "Management Member"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Third Amended and Restated Limited Partnership Agreement of the Partnership, dated as of October 20, 2021, as amended from time to time (the "Partnership Agreement"). Each party to this Agreement is referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Partnership and General Partner wish to preserve the goodwill and confidential information of the Partnership and the Group; and

WHEREAS, the Management Member is being granted the Units subject to the Management Member's agreement to the covenants set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.       Restrictive Covenants.

(a)       Non-Compete.

(i)       The Management Member agrees that during the period of the Management Member's employment with or provision of service to the Partnership or any Group Company, the Management Member shall not, directly or indirectly, render advice or provide services to any Person or business that is, in whole or in part, a Competitor.

(ii)       The Management Member further agrees that from the Termination Date and until the end of the twelve (12) calendar month period following the Termination Date, the Management Member shall not, directly or indirectly, engage in any Competitive Activity in the Restricted Area for, or on behalf of, any Person or business that is, in whole or in part, a Competitor.

(iii)       Nothing in this Section 1(a)(i) or (ii) shall be deemed to prohibit the Management Member from a passive investment of up to five percent (5%) in another business.

(iv)       For the purposes of this Section 1(a):

(1)     "<u>Competitive Activity</u>" shall mean rendering advice or providing any services that are the same as or similar in function or purpose as those the Management Member provided to the Partnership or any Group Company at any time during the twenty-four (24) calendar month period preceding the Termination Date, including, without limitation, providing executive leadership, product and strategy development, marketing and resource allocation guidance;

(2)     "<u>Competitor</u>" shall mean any business that (x) engages in any business in which the Group is engaged in as of such date, but ending on the Termination Date, including without limitation, (I) the business of providing software for business development, pricing, marketing or talent management to the legal sector, including law firms across the world and (II) the business of providing software for drafting, proofreading, comparing, repairing, cleaning, securing documents, transaction management, contract analytics and litigation management (including any software that competes with the Litera software, including but not limited to, Litera Transact, Kira and Litigate) to legal and life sciences customers and others across the world or (y) otherwise engages in business that the Partnership or any Group Company intends, in the following twelve (12) calendar month period, to actively pursue in a material respect, and that has been discussed by the General Partner Board and of which the Management Member has knowledge; and

(3)     "<u>Restricted Area</u>" shall mean the United States of America and any other country in which the Management Member provided services or had a material presence or influence for or on behalf of the Partnership or any Group Company during the twenty-four (24) calendar month period immediately preceding the Management Member's Termination Date.

(b)     <u>Non-Solicit</u>. The Management Member agrees that, during the period of the Management Member's employment with or provision of service to the Partnership or any Group Company, and until the end of the twenty-four (24) calendar month period following the Termination Date (the "<u>Management Member Restricted Period</u>"), the Management Member shall not (other than on behalf of the Partnership or any Group Company), directly or indirectly,

(i)     solicit or entice away, or endeavor to solicit or entice away, from the Partnership or any Group Company, or employ or engage, or endeavor to employ or engage, any person who was employed or engaged by the Partnership or any Group Company and with whom the Management Member had dealings during the then immediately preceding twelve (12) calendar month period, but ending on the Termination Date, whether or not such person would commit a breach of their employment contract, service contract or other arrangement by reason of leaving service; <u>provided</u>,

*however*, that this restriction shall not prevent the Management Member, or any Person with which the Management Member may become affiliated with (as long as not otherwise in violation of this Agreement), from soliciting for employment or engagement, or employing or engaging, any person (x) who responds to a general solicitation or advertisement that is not directed to employees or independent contractors of the Partnership or any Group Company or (y) whose employment or engagement was terminated by the Partnership and Group, other than for cause; or

(ii) solicit, induct or interfere with any Person who at any time during the then immediately preceding twenty-four (24) calendar month period, but ending on the Termination Date had been an existing or prospective customer, supplier, client, distributor, vendor, investor or other business relationship of the Partnership or any Group Company so as to compete with, harm the goodwill of or in any way interfere with the relationship with the Partnership or any Group Company during such period; provided, however, that this restriction shall only apply to existing or prospective customers, suppliers, clients, distributors, vendors, investors or other business relationships of the Partnerships or any Group Company with whom the Management Member first had direct or actual contact, or about whom the Management Member received or had access to Confidential Information, during the Management Member's employment with or provision of service to the Partnership or any Group Company.

(c) Non-Disclosure. The Management Member acknowledges that the continued success of the Partnership and the Group depends upon the use and protection of confidential information.

(i) Subject to Section 2, the Management Member agrees that the Management Member will not, during the period of the Management Member's employment with or provision of service to the Partnership or any Group Company or anytime thereafter, disclose to any unauthorized person or use for the Management Member's own account any Confidential Information, whether or not such information is developed by the Management Member, without the General Partner Board's written consent, unless and to the extent that the information becomes generally known to the public other than as a result of the Management Member's acts or omissions to act in violation of this Section 1(c).

(ii) "Confidential Information" shall mean any and all knowledge and information related to the business and affairs of the Partnership and the Group that are not or are not intended by the Partnership and the Group to be publicly known or available, including, but not limited to, information relating to a client or a vendor's confidential or proprietary information, as well as information that assists the Partnership or any Company Group in making sales to a client or purchases from a vendor, any confidential ideas, research and development, finances, costs, profit margins, marketing,

merchandising, know-how, formulas, customer lists, customer requirements, pricing, pricing methods, proprietary technology, developments, products, computer programs and techniques, work product and any other confidential or trade secret information.

(d)     Non-Disparagement. Subject to Section 2, the Management Member agrees that during the Management Member Restricted Period, the Management Member shall not, directly or indirectly, engage in any conduct or make any statement (orally or in writing) or release any information that damages the reputation of, or otherwise disparages, defames or criticizes the Partnership, any Group Company, Hg, the Hg Funds, the Hg Partner, any other Partner or any of their respective Affiliates, employees, officers, directors, managers, partners or successors.

2.     Permitted Disclosures.

(a)     Pursuant to 18 U.S.C. § 1833(b), the Management Member shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret of the Partnership or any Group Company that (i) is made (A) in confidence to a Federal, State or local government official, either directly or indirectly, or to the Management Member's attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If the Management Member files a lawsuit for retaliation by the Partnership or any Group Company for reporting a suspected violation of law, the Management Member may disclose the trade secret to the Management Member's attorney and use the trade secret information in the court proceeding, if the Management Member (x) files any document containing the trade secret under seal and (y) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.

(b)     Furthermore, nothing in this Agreement or any other agreement by and between the Management Member and the Partnership or any Group Company shall prohibit or restrict the Management Member from: (i) voluntarily communicating with an attorney retained by the Management Member, (ii) voluntarily communicating with any law enforcement, government agency, including the Securities and Exchange Commission ("SEC"), the Equal Employment Opportunity Commission, a Federal, State or local commission on human rights, or any self-regulatory organization regarding possible violations of law, in each case without advance notice to the Partnership or any Group Company, or otherwise initiating, testifying, assisting, complying with a subpoena from, or participating in any manner with an investigation conducted by such government agency, (iii) recovering an SEC whistleblower award as provided under Section 21F of the Securities Exchange Act of 1934, or (iv) disclosing any Confidential Information to a court or other administrative or legislative body in response to a subpoena, court order or written request, provided that the Management Member first promptly notifies and provides the Partnership and Group with the opportunity to seek, and join in its

4

efforts at the sole expense of the Partnership and Group, to challenge the subpoena, court order or written request or obtain a protective order limiting its disclosure, or other appropriate remedy.

3.  <u>Modification</u>. The Parties agree and acknowledge that the duration, scope and geographic area of the covenants described in this Agreement are fair, reasonable and necessary in order to protect the good will and other legitimate interests of the Partnership and the Group, that adequate consideration has been, or will be, received by the Management Member for such obligations and that these obligations do not prevent the Management Member from earning a livelihood. If, however, for any reason any court of competent jurisdiction determines that the restrictions in this Agreement are not reasonable, that consideration is inadequate or that the Management Member has been prevented unlawfully from earning a livelihood, such restrictions will be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in this Agreement as will render such restrictions valid and enforceable.

4.  <u>Remedies for Breach</u>. The Parties agree that the restrictive covenants contained in this Agreement are severable and separate, and the unenforceability of any specific covenant herein will not affect the validity of any other covenant set forth herein. The Management Member acknowledges that the Partnership and the Group will suffer irreparable harm as a result of a material breach of such restrictive covenants by the Management Member for which an adequate monetary remedy does not exist and a remedy at law may prove to be inadequate. Accordingly, this Agreement may be enforced at any time by the Partnership and, as third-party beneficiaries of this Agreement, any Group Company, and, in the event of any actual or threatened breach by the Management Member of any provision of this Agreement, the Partnership or the applicable Group Company will, in addition to any other remedies permitted by law or otherwise set forth in this Agreement, be entitled to seek to obtain remedies in equity, including, without limitation, specific performance, injunctive relief, a temporary restraining order and/or a permanent injunction in any court of competent jurisdiction, to prevent or otherwise restrain a material breach of this Agreement, without the necessity of proving damages, posting a bond or other security. Such relief will be in addition to and not in substitution of any other remedies available to the Partnership or any Group Company. The existence of any claim or cause of action of the Management Member against the Partnership or any Group Company, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Partnership or any Group Company of said covenants.

5.  <u>General</u>.

   (a)  <u>Miscellaneous</u>. Section 17.1 (Notices), Section 17.8 (Counterparts), Section 17.12 (Binding Effect) and Section 17.16 (Jurisdiction; Service of Process) of the Partnership Agreement are incorporated by reference herein as if the same had been set forth herein *pari passu*.

   (b)  <u>Entire Agreement</u>. Notwithstanding any other provision to the contrary contained herein, this Agreement is not intended to (and shall not be deemed to) limit, decrease or reduce the scope of any prior or future restrictive covenants contained

in any agreement to which the Partnership or any Group Company and the Management Member are party, including, without limitation, any non-competition, non-solicitation, no-hire, non-disclosure, non-disparagement or similar provisions.

(c)     <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of laws thereof.

**[SIGNATURE PAGES FOLLOW]**

DocuSign Envelope ID: JC95AE7B-EC07-4E28-ADB4-EEZ62ACCA101

<u>EXECUTION VERSION</u>

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the day and year first above written.

PARTNERSHIP:

Litera Holdco LP

By: _____

      Name:  Avaneesh Marwaha

      Title:  Authorised Signatory

GENERAL PARTNER:

Litera Intermediate Holdco LLC

By: _____

      Name:  Avaneesh Marwaha

      Title:  Authorised Signatory

*[Signature Page to Restrictive Covenants Agreement]*

MANAGEMENT MEMBER:

By: Kennan Samman

*[Signature Page to Restrictive Covenants Agreement]*

8